Colón et al., Recurrentes, *v.* El Registrador de Aguadilla, Recurrido.

Recurso gubernativo contra nota del Registrador de la Propiedad de Aguadilla denegando la inscripción de una escritura de cancelación de hipoteca.

No. 214.—Resuelto en abril 21, 1915.

Derecho Internacional Privado—Reglas Establecidas por las Cortes Americanas.—Las cortes insulares, hasta donde estén en libertad de elegir las reglas para evitar conflictos de leyes entre sí, deben considerar los derechos sustanciales e intereses y conveniencias de los ciudadanos, a la luz de la condición política y de las relaciones comerciales de la isla, antes que los méritos relativos de teorías opuestas; y, en cuanto sea compatible con nuestro sistema especial de leyes locales, deben tratar de ajustar sus reglas a lo decidido por las cortes federales y de estado.

Lex Rei Sitæ—Capacidad de las. Partes—Código Civil—Estatutos Real y Personal—Efectos de Leyes Extranjeras.—La adopción y aplicación de la regla *lex rei sitæ* en la forma en que lo han hecho las cortes americanas, incluyendo y regulando la capacidad de las partes, no quebranta ni la letra ni el espíritu de nuestro Código Civil, ni ninguno de sus principios fundamentales y establece, de una vez para siempre, una regla fija, simple y racional, conducente a evitar la inconsistencia y confusión de nuestras decisiones referentes a los estatutos real y personal y al efecto de leyes extranjeras.

Cancelación de Hipoteca—Tutor Español de Menores Españoles Residentes todos en España—Autorización Judicial—Interpretación de Ley.— Interpretando los artículos 9, 10, 11, 282 y 284 del Código Civil vigente, en relación unos con otros, y todos a la luz de los cambios y enmiendas introducidas por la Legislatura en 1902 y Legislaturas subsiguientes, así como de la intención manifiesta y objeto de los mismos, el tutor español de menores españoles residentes todos en España autorizado por el Consejo de Familia, conforme lo exige el Código Civil Español, o el apoderado o mandatario designado al efecto por dicho tutor, necesitan la autorización previa de la corte de distrito del lugar en donde radiquen los bienes para proceder a la cancelación de una hipoteca sobre bienes inmuebles radicados en Puerto Rico.

Los hechos están expresados en la opinión.

Abogados de los recurrentes: *Sres. Reichard & Reichard.*

El Registrador recurrido Sr. Rafael Tirado Verrier compareció en nombre propio.

El Juez Asociado Sr. Hutchison, emitió la opinión del tribunal.

Una sola cuestión ofrece este caso para ser resuelta por este tribunal tal como ha sido presentado. Esta es si el tutor español de menores españoles, con residencia en España tanto el tutor como los menores, que ha sido debidamente autorizado por el Consejo de Familia como lo exige el Código Español para proceder a la cancelación de una hipoteca sobre bienes inmuebles radicados en Puerto Rico, o el apoderado debidamente nombrado de dicho tutor antes de poder otorgar dicha escritura de cancelación en esta isla, debe o nó obtener una orden de una corte de distrito insular que lo autorice para ello de conformidad con los preceptos de la ley local.

El Registrador de la Propiedad de Aguadilla se negó a inscribir una escritura de cancelación de hipoteca otorgada en Aguadilla por el mandatario y apoderado de un tutor

español en las circunstancias que acabamos de expresar, por el único fundamento de no haberse obtenido previamente para ello la autorización judicial requerida por el párrafo 5°. del artículo 282 de nuestro Código Civil revisado al cual se hace referencia en la nota como "la única legislación aplicable al caso, por radicar en Puerto Rico el derecho que se trata de cancelar, considerado por la ley como un inmueble."

Los artículos 9, 10 y 11 del Código Civil, y el 282 de dicho Código en lo que es pertinente a la cuestión que se discute, se expresan como sigue:

"Artículo 9.—Las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal de las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros.

"Artículo 10.—Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos.

"Artículo 11.—Las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, se rigen por las leyes del país en que se otorguen.

"Cuando los actos referidos sean autorizados por funcionarios diplomáticos o consulares de los Estados Unidos en el extranjero, se observarán en su otorgamiento las solemnidades establecidas por las leyes de los Estados Unidos.

"No obstante lo dispuesto en este artículo y en el anterior, las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas ni por disposiciones o convenciones acordadas en países extranjeros."

"Artículo 282.—El tutor necesita autorización de la corte de distrito competente:

\*     \*     \*     \*     \*     \*     \*

"5. Para enajenar o gravar bienes inmuebles que constituyan el capital de los menores o incapaces, o hacer contratos o actos sujetos a inscripción, así como para enajenar bienes muebles cuyo valor pase de doscientos dólares y para otorgar contratos de arrendamiento de bienes inmuebles por un término mayor de seis años, sin que en ningún caso el arrendamiento pueda efectuarse ni la autorización concederse por un período de tiempo que exceda al que falte al menor para cumplir su mayoridad.

"Las limitaciones contenidas en el apartado anterior, sobre arrendamiento de bienes inmuebles, serán aplicables a los contratos de refacción agrícola y molienda de cañas, autorizados por la ley aprobada en marzo 10 de 1910.

"La prohibición de enajenar bienes muebles, por valor excedente de doscientos dólares, sin autorización judicial no comprende la enajenación de los frutos de una finca rústica, en su última cosecha."

\*        \*        \*        \*        \*        \*        \*

Los artículos 9 y 11, *supra,* son substancialmente idénticos a sus concordantes del código español. Los artículos 10 y 269 de este último código correspondientes a los artículos 10 y 282, *supra,* prescriben lo siguiente:

"Artículo 10.—Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles a las leyes del país en que están sitos.

"Sin embargo, las sucesiones legítimas y las testamentarias, así respecto al orden de suceder como a la cuantía de los derechos sucesorios y a la validez intrínseca de sus disposiciones, se regularán por la ley nacional de la persona de cuya sucesión se trate, cualesquiera que sean la naturaleza de los bienes y el país en que se encuentren."

\*        \*        \*        \*        \*        \*        \*

"Artículo 269.—El tutor necesita autorización del Consejo de Familia:

\*        \*        \*        \*        \*        \*        \*

"5.—Para enajenar o gravar bienes que constituyan el capital de los menores o incapaces, o hacer contratos o actos sujetos a inscripción.

\*        \*        \*        \*        \*        \*        \*

En el Informe de la Comisión Codificadora Insular del año 1902, encontramos la siguiente expresiva y luminosa explicación acerca de las innovaciones introducidas en el Título Preliminar, incluyendo la omisión que se ha hecho de la última parte del artículo 10 del Código Español, a saber:

"La reforma más importante hecha en el Título Preliminar del Código ha sido la relativa a restringir la doctrina de los estatutos personal y real, tomando en cuenta y aplicando el principio general del derecho civil americano de que los derechos respecto de los bienes inmuebles han de regularse totalmente, así en cuanto a la con-

tratación como en cuanto a los derechos hereditarios, por la ley. del país en que están sitos.''

No es necesario discutir ni siquiera reproducir las bien conocidas reglas de *lex loci celebrationis* y *lex rei sitæ* según han sido interpretadas y aplicadas por las cortes americanas para regular la capacidad de las partes contratantes. Véase 5 R. C. L., 925, 949, 952, y 32 Cyc., 674.

Con brevedad y discernimiento de suyo característicos, el Profesor Raleigh C. Minor, en la página 28 de su excelente e ingenioso tratado sobre el Conflicto de las Leyes, expresa habilmente cual es la verdadera razón de la regla a que acabamos de hacer referencia tal como ha sido aplicada en todos los Estados Unidos:

''Aunque este principio es generalmente reconocido el motivo que lo informa no siempre ha sido tenido claramente en cuenta. Verdaderamente que sólo constituye una sub-división de la primera excepción que ya ha sido discutida, y lo que se conoce por *lex situs*, no es otra cosa según la última consideración que se ha hecho que la *lex fori*. Puesto que la propiedad inmueble radica para siempre en el Estado en que se encuentra y como ningún otro Estado puede tener jurisdicción sobre la misma se deduce necesariamente que no puede adquirirse en definitiva ningún derecho, título o interés sobre ella a no ser que ·sea consentido por las cortes de ese Estado de acuerdo con sus leyes. Las cortes de ningún otro Estado pueden resolver en definitiva tales cuestiones de modo que confieran o priven a un litigante de un derecho a la propiedad. Por otra parte, las cortes del lugar donde radica la propiedad deberán ser estrictamente rigurosas en exigir que se cumpla con la ley del sitio en que se encuentra dicha propiedad en lo que respecta al traspaso del título a esa clase de propiedad. Las prácticas (*policies*) de cada Estado con respecto a traspasos de bienes inmuebles comprendidos en sus límites están consideradas justamente entre las más importantes de todas sus prácticas con respecto a las cuales no·se tolerará ninguna intromisión extraña. Cada Estado hace lo que está a su alcance con el fin de que sus leyes que afectan a la entrega, traspaso y gravamen de bienes inmuebles situados dentro de sus límites sean lo más terminantes y precisas posibles. Se exigen formalidades especiales que no se requieren en otras cuestiones. Y es sumamente importante que las inscripciones legales de dichas transacciones ·las cuales consti-

tuyen series de títulos a los bienes inmuebles, se conserven libres de toda censura, irregularidad o confusión con los requisitos de otros Estados.

"Por tanto, viene a ser especialmente parte de la política de todo Estado el no permitir que se verifique ninguna transacción relativa al traspaso de cualquier derecho o título a la propiedad inmueble que radica en dicho Estado si con ello se infringe su propia ley ya sea o nó valida de acuerdo con las leyes de Estados extranjeros. Estas razones son enteramente suficientes para que las cortes del lugar en que radica la propiedad sean inducidas (cuando el sitio es el de la corte) a dar preferencia a sus mismas leyes sobre la materia a las de cualquier otro Estado.

"Ni pretenderán las cortes de otros Estados hacer valer sus propias leyes relativas a los bienes inmuebles situados en otras partes, no solamente por espíritu de cortesía y su repugnancia a observar una conducta hacia otros Estados que no permitirán que estos últimos la observaran con ellos mismos, sino también y tal vez principalmente por la absoluta imposibilidad en que se encuentran para dictar cualquier sentencia o decreto que sea definitivo y eficaz para traspasar cualquier derecho sobre el inmueble. Por tanto, en vez de dictar sentencias que son ociosas de conformidad con su misma ley, al considerar el título de los bienes inmuebles radicados en países extranjeros, las cortes tratarán de fijar las reglas establecidas por la *lex situs* de dichos bienes, y resolverán de acuerdo con esa ley, pues a ella deben acudir las partes en definitiva en todo caso.

"Viene, pues, a ser un principio bien establecido de derecho internacional privado, sostenido por un fuerte núcleo de autoridades, que todas las cuestiones relativas a traspasos de títulos sobre bienes inmuebles donde quiera que surjan se regirán por la *lex situs,* o sea por la ley del tribunal en que finalmente deban ser resueltas en definitiva todas esas cuestiones."

La resolución de este caso no nos obliga necesariamente a oponernos a la sabiduría de Story y Wharton o a combatir la lógica persuasiva de Fiore y la tendencia moderna del pensamiento europeo. Mientras podamos elegir la regla por la que debemos resolver si un caso determinado está comprendido o no en el estatuto personal o real, debemos considerar los derechos sustanciales, intereses y conveniencia de nuestros propios ciudadanos, a la luz de nuestra actual condición política y relaciones comerciales futuras de acuerdo

con el nuevo estado de cosas creado por virtud del reciente cambio de soberanía, mas bien que por los méritos intrínsecos de tal o cual teoría considerada en abstrato.

Puede que sea conveniente que hagamos una diferencia entre aquellas cuestiones que surjen directamente de un verdadero conflicto de las leyes y las que proceden de reglas contradictorias de las decisiones en cuanto al particular, o dicho tal vez con más propiedad, de opiniones que están en conflicto respecto a si una regla que ha sido reconocida universalmente debe o no aplicarse, y cómo y hasta qué punto, para regular un caso determinado.

"Las leyes del Estado que realmente son aplicadas dentro del territorio de otro Estado son leyes nacionales; las reglas por virtud de las cuales se aplican son reglas internacionales. Al describir dichas reglas Sir Henry Maine ha hecho referencia a ellas en el sentido de que 'prescriben las condiciones por las cuales una comunidad reconocerá y aplicará una parte de la jurisdicción de otra.' Si añadimos el fin manifiesto con que se hicieron dichas reglas, la frase se completa por sí—'Reglas Internacionales para Evitar el Conflicto de las Leyes.' Cuando la frase más corta 'Conflicto de las Leyes,' se usa simplemente como abreviación no existe ningún inconveniente." Taylor, Ciencia de la Jurisprudencia, página 627.

Hace ya más de medio siglo que un abogado de Louisiana de clara penetración hizo referencia a esta distinción:

"Puede que no sea improcedente llamar aquí la atención hacia el hecho de que los principios con arreglo a los cuales han sido resueltas las cuestiones que surjen del conflicto de las leyes en las cortes que actúan de conformidad con la ley civil o la común parecen ser enteramente independientes de una u otra como sistema. Es verdad que el conflicto puede surgir de la diferencia que hay entre los principios de la ley común y la civil, como ha sucedido frecuentemente en este Estado en materia de ventas: 4 Mart., 20; 5 Mart., 23; 7 Mart., 24; 2 Mart. N. S., 93. Pero es claro que los principios por los cuales ha de resolverse este conflicto son completamente distintos de los principios qué establecen los mismos derechos en conflicto. Es cierto que con frecuencia se hace alusión en las Pandectas a la diversidad de leyes entre diferentes Estados, y los jurisconsultos Romanos 'han establecido principios que han servido de norma para diri-

gir las operaciones de sus sucesores.' Disertaciones de Livermore, párrafos 2 y 8. Pero ellos solamente han resuelto pocos casos y no existe nada ya en la materia misma o en las autoridades extranjeras que han tratado de ella que sea más adecuado al genio de la ley civil que de la común. Y por tanto aunque la primera sea la base de nuestra propia jurisprudencia, en cuanto a esta materia no vemos, sin embargo, razón alguna por la que la corte al considerar esta cuestión deba mirar menos favorablemente la regla establecida por las cortes inglesas y americanas, simple y compatible como es, que las especulaciones y teorías de escritores que han establecido sistemas que estan siempre en pugna unos con otros, y frecuentemente con ellas mismas.'' 3 La. Ann., 420.

Como ejemplo de la bien reconocida y loable tendencia de la Corte Suprema de Louisiana a ajustarse a los principios de la ley común y a poner en línea las reglas que rigen sus decisiones con las de los demás Estados y de la Corte Suprema de los Estados Unidos, en todo aquello en que sean compatibles con los principios fundamentales del sistema especial y fundamental de leyes locales que están allí en vigor y que en muchos particulares son substancialmente idénticas a las nuestras, podemos llamar la atención sin hacer citas o comentarios, al prefacio del Código Civil de Louisiana por Saunders, 1909, y a los procedimientos de la Celebración del Centenario publicados en el tomo 133 de las Decisiones de Louisiana, haciendo referencia especialmente a la hábil discusión acerca de la Jurisprudencia de Louisiana por Charles Payne Fenner, Profesor de Derecho Civil de la Escuela de Leyes de la Universidad de Tulane, y al elocuente tributo del Juez T. C. W. Ellis a la Asociación de Abogados de Louisiana, 1813-1913. Véase también la obra El derecho, su origen, desarrollo y funciones por Carter, página 304, y el prólogo del tratado La Ciencia de la Jurisprudencia por Taylor, y capítulo sobre la Ley Romana e Inglesa combinadas, páginas 465-497.

No existen términos medios. Debemos francamente y sin reserva mental alguna aceptar o rechazar rotundamente la aplicación de la regla americana de *lex rei sitæ* como la ver-

dadera norma que ha de seguirse al determinar la capacidad legal de las partes en transacciones sobre bienes inmuebles. Puede, por tanto, sernos de utilidad la experiencia de la Corte Suprema de Louisiana, y adoptando ahora de una vez para siempre una regla simple, fija, amplia y racional, evitar en nuestras mismas decisiones relativas al estatuto real y personal y al efecto de leyes extranjeras las contradicciones y confusión de la ley de Louisiana en cuanto a la materia en los primeros períodos de su difícil y lastimosamente fluctuante desarrollo.

Es procedente también al establecer un precedente de ésta clase que tengamos presente el punto de vista desde el cual podrían ser consideradas dichas cuestiones en apelación contra una resolución de este tribunal y teniendo debidamente en cuenta las distinciones que puedan hacerse en los casos que se originen en otras cortes que no sean las Federales, podemos hacer referencia a la nota excelente y amplia que se hace en el caso de *Snare & Triest Co.* v. *Friedman,* 40 L. R. A., Nueva Serie, página 380, que trata de "Cuestiones relativas a la ley de Estado respecto a cuál de las decisiones de las más altas cortes de Estado deberá seguirse en las acciones que se originan o que son trasladadas a las Cortes Federales," y especialmente a los párrafos IV *h,* conflicto de las leyes, (página 426), y III, cuestiones constitucionales y estatutarias; *e.,* el efecto a diferencia de la interpretación; decisiones fundadas en razonamientos generales; alcance de la decisión, (página 399).

Ya este tribunal ha declarado en el caso de *Cruz* v. *Domínguez,* 8 D. P. R., 580, haciendo referencia expresa al *status* o condición política de la isla "que los principios de derecho internacional privado que hayan de aplicar sus tribunales, deben ser los mismos que se han desarrollado en los Estados Unidos, por lo menos en materia de divorcio;" y el interpretar la regla universal de *lex rei sitæ* en el sentido de que comprende y regula la capacidad de las partes que directamente intervienen con bienes inmuebles radicados en

Puerto Rico de modo alguno quebranta la letra o espíritu de nuestro código civil o ningún principio fundamental en que descanse.

Además, ya este tribunal ha dado esa interpretación a la regla en cuestión por lo menos en un caso. En el recurso gubernativo seguido por Amadeo contra El Registrador, 3 D. P. R., 141 (2ª. ed.), un ciudadano francés traspasó determinados bienes inmuebles por medio de una escritura de venta en la que se hacía constar, en vista del artículo 159 relativo a la enajenación de bienes inmuebles pertenecientes a la sociedad conyugal, que de conformidad con los preceptos del Código Francés, el cuál alegó el vendedor que regulaba la transacción, éste tenía la administración de todos los bienes de la sociedad conyugal sin restricción de ninguna clase.

El Registrador de la Propiedad de Ponce se negó a verificar la inscripción de la escritura porque "resultaba de la misma que Don Felipe Pietri y Moretti es de estado casado, la enajenación se ha otorgado sin consentimiento de su mujer, que previene el artículo 1308 del Código Civil."

Este tribunal por conducto del Juez Presidente Sr. Quiñones se expresó como sigue:

"Con arreglo al artículo del nuevo código civil que cita el registrador en su nota y que corresponde al 1328 de la edición oficial del mismo código, no obstante las facultades que tiene el marido como administrador de la sociedad de gananciales, no podrá donar, enajenar ni obligar a título oneroso los bienes inmuebles de la expresada sociedad, sin el consentimiento expreso de la mujer; y que toda enajenación o convenio que sobre dichos bienes haga el marido en contravención a dicho artículo, será nulo y no perjudicará a ésta, ni a sus herederos; precepto que es aplicable al contrato de enajenación de bienes inmuebles de que se trata en el presente recurso, por haber sido otorgado por Don Felipe Pietri y Moretti en 22 de diciembre último, o sea en fecha muy posterior a la en que comenzó a regir en esta isla el expresado código civil.

"Que no se opone a la aplicación de dicho precepto, en el presente caso, la manifestación consignada por los interesados en la cláusula cuarta de la expresada escritura, relativa a la capacidad del vendedor Don Felipe Pietri para otorgar el contrato de referencia con arreglo

a las leyes de su nación, como ciudadano francés, toda vez que según los principios del derecho internacional privado, admitidos universalmente para la resolución de esta clase de conflictos, las cuestiones relativas a la eficacia o nulidad de los actos o contratos que afecten directamente la propiedad inmueble se regulan por las leyes del estatuto real, o sea por las leyes del lugar donde radiquen dichos bienes inmuebles; principio reconocido y sancionado por el nuevo código civil en sus artículos 10 y 1292, al establecer el primero que los bienes inmuebles están sujetos a las leyes del país en que están sitos, y el segundo que si el matrimonio se contrajere en país extranjero entre puertorriqueño y extranjera, o vice-versa, entre extranjera y puertorriqueño, y nada declarasen o estipulasen los contratantes relativamente a sus bienes, se entenderá cuando sea puertorriqueño el cónyuge varón, que se casa bajo el régimen de la sociedad de gananciales; y cuando fuere puertorriqueña la esposa, que se casa bajo el régimen del derecho común en el país del varón; "pero todo sin perjuicio de lo establecido en el mismo código respecto de los bienes inmuebles." 3 D. P. R., 143, 144, 2ª. ed.

Es cierto que la Dirección General de los Registros de España en el año 1894 y en un caso algo semejante al que ahora consideramos declaró, basada en la teoría de una reciprocidad tácita de las prescripciones del artículo 9 del Código Civil Español y en los principios generales de derecho internacional privado, que "la institución de la tutela se rige por la ley nacional del menor aunque sus bienes radiquen en país extranjero, siendo la razón de ello, la de que, confiada a la ley nacional la protección de los ciudadanos, no fuera justo arrebatarla uno de sus más altos y delicados fines, que es el que preside a la organización de la tutela;" "que las leyes relativas a la capacidad legal de las personas, y por tanto a la manera de completarla cuando es deficiente, obligan a los españoles aunque residan en país extranjero; criterio jurídico lógicamente aplicable cuando se trata de apreciar la capacidad de un extranjero en España, ya que la fuerza extraterritorial de nuestras leyes demanda, a virtud del principio de reciprocidad, igual eficacia en las leyes de otros países;" y por tanto el apoderado del tutor inglés de un menor inglés con residencia éstos últimos en Londres,

no tenía que obtener la autorización del Consejo de Familia en España para poder aceptar el traspaso de un crédito hipotecario constituído por documento notarial a favor de dicho menor.

Si nuestra Legislatura en el año 1902 hubiera. revalidado meramente el Código Español en su totalidad sin hacer ningún cambio o modificación en los artículos que han sido interpretados por la "Dirección General," o en otros artículos correlativos y no hubiera habido enmiendas subsiguientes, entonces quizás no tendríamos inconveniente alguno en aceptar con el Código la interpretación que se le dió.    Pero no es ese el caso.

En perfecta harmonía con el espíritu de la revisión recomendada por la Comisión Codificadora con el propósito deliberado de "aplicar el principio general del derecho americano de que todos los derechos respecto de los bienes inmuebles han de regularse, así en cuanto a la contratación como en cuanto a los derechos. hereditarios, por la ley del país en que están sitos," nuestra Legislatura no solamente ha eliminado del artículo 10 del Código Español el precepto de que las "sucesiones legítimas y las testamentarias así respecto al orden de suceder como a la cuantía de los derechos sucesorios y a la validez intrínseca de sus disposiciones, se regularán por la ley nacional de la persona de cuya sucesión se trate, cualesquiera que sean la naturaleza de los bienes y el país en que se encuentren," y todo el contenido del Título I, Libro Primero de dicho Código, incluyendo el artículo 27 del mismo que dispone que "los extranjeros gozan en España de los derechos que las leyes civiles conceden a los españoles," etc., sino que al revalidar el artículo 269, equivalente al 282 de nuestro código, establece una clara distinción entre bienes inmuebles y muebles; y como para desvanecer cualquier duda posible respecto a la intención de substituir la *lex rei sitæ* y la *lex fori* por la ley del lugar en que se encuentra la persona en tales casos, ha dispuesto además expresamente en el artículo 284, lo siguiente:

"La autorización judicial para enajenar, gravar o arrendar bie-· nes de un menor o incapaz, o transigir o comprometer en árbitros las cuestiones privadas o judiciales que afecten los derechos del menor o incapaz, será resuelta por la corte de distrito en que los bienes radiquen, o ante la que se siga o haya de seguirse la cuestión litigiosa, previa comprobación de los motivos de necesidad o utilidad, de acuerdo con lo dispuesto en esta ley y la referente a procedimientos legales especiales."

No es necesario que expresemos en toda su extensión los particulares de la ley que regula los procedimientos especiales en cuestión. Debe admitirse que en la práctica algunos de los requisitos exigidos por los artículos 80 y 81 de la ley podrían propiamente ser considerados como no aplicables al caso de un tutor extranjero. Aun en lo que respecta a los bienes inmuebles ciertos detalles que tienden principal- mente a proteger a los menores y sus intereses tal vez podrían ser considerados como inaplicables al tutor extranjero o por lo menos la regla pudiera ser mucho más liberal en cuanto a la prueba que haya de exigirse; pero no procede decir que la Legislatura no ha hecho otra cosa que sustituir la autorización de la corte de distrito por la del consejo de familia si esa proposición tiene por objeto establecer como corolario la conclusión consiguiente de que la corte de distrito está meramente en el lugar del consejo de familia y que dicha sustitución no produce efecto o cambio legal alguno en el alcance, naturaleza, condición, facultades, punto de vista y objeto de la autoridad supervisora.

Si no puede la Corte de Distrito de San Juan en el ejercicio de su intervención en una tutela que por otra parte está enteramente bajo su poder, autorizar la venta de una propiedad en Ponce, y si el tutor de San Juan no obstante ese poder si tratase de realizar la venta tendría que acudir al Juez de Distrito de Ponce, ¿cómo es posible que pueda considerarse que el Consejo de Familia que reside en España tiene tal facultad para conceder el permiso, y con arreglo a qué sano principio puede considerarse al tutor español

superior a la ley que es obligatoria para el tutor de San Juan? Si la ley que ahora rige en Puerto Rico lo mismo que el Código Español, tuvo en cuenta principalmente la protección de los menores y sus intereses con preferencia a la de otras personas interesadas en los bienes inmuebles y en asuntos que constan del registro de la propiedad o que están pendientes en la corte de distrito del lugar donde dichos bienes están situados, entonces, sin duda alguna, la corte que ejercita sus facultades sobre la tutela jamás hubiera sido arbitrariamente privada de una parte tal de su jurisdicción que naturalmente resulta de su subrogación en los derechos, facultades y deberes del extinguido consejo de familia. La única razón, justificación o excusa posible para hacer la distinción que establece el párrafo 5°. del artículo 282 y de la disposición terminante del artículo 284, parece ser la misma en que se funda la aplicación que hacen las cortes americanas de la *lex rei sitæ* en tales casos. La ley no establece diferencia alguna entre el tutor del país y el extranjero, ni crea exención en favor de este último; e interpretando el artículo 9 del Código en relación con los demás preceptos de la ley arriba citada y a la luz de los cambios y enmiendas a que se ha hecho referencia así como de la intención manifiesta y objeto de los mismos, nos vemos obligados a declarar que al intervenir un tutor extranjero con bienes inmuebles situados en Puerto Rico en las condiciones expresadas deberá obtener previamente la autorización de la corte de distrito del distrito del lugar en que estén sitos dichos bienes de conformidad con las prescripciones de los artículos 282 y 284 de nuestro Código Civil.

Debe confirmarse la nota del registrador de la propiedad.

*Confirmada la nota recurrida.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y Aldrey.

APELACIÓN procedente de la Corte de Distrito de Mayagüez
en causa por falsa representación.