404

ARTURO F. ARMSTRONG, demandante y recurrido, *v.* MARÍA
   EMILIA ARMSTRONG DE DEL VALLE ET AL., demandados
   y recurrentes.

*Número:* 144.   *Resuelto:* 11 de mayo de 1962.

*Orlando J. Antonsanti* y *Alberto J. Torruella,* abogados de los recurrentes; *Antonio Zapater Cajigas,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Se plantea si un testamento hecho fuera de Puerto Rico por una persona que no es ciudadana de Puerto Rico y en cuyo otorgamiento se observaron las formas y solemnidades del país en que se otorgó es válido en Puerto Rico, y particularmente en este caso a los fines de trasmitir derechos sobre bienes inmuebles sitos en este país. Se trata de requisitos formales del documento y no de fondo o intrínsecos. No se plantea que lo dispuesto en el testamento contravenga nuestro derecho sustantivo sucesoral. ■

El demandante, Arturo F. Armstrong, inició un procedimiento en el Tribunal Superior, Sala de Ponce, solicitando se declarase nulo el testamento otorgado en Nueva York por su difunta abuela, Doña Emilia Villaronga viuda de Armstrong. También solicita la anulación de un codicilo escrito a mano por la testadora e igualmente ejecutado en Nueva York.

En cuanto a los hechos no hay controversia. Emilia Villaronga viuda de Armstrong nació en Puerto Rico en 1875 y falleció en Nueva York en 1957, en donde residía desde el 1910. Allí, en Nueva York, otorgó formalmente testamento en 1934. Los únicos hijos de la difunta testadora fueron Carlos G. Armstrong Villaronga y María Emilia Armstrong Villaronga. El primero, quien falleció en el 1931, tuvo dos

hijos: Carlos José, el cual murió en el 1936 sin dejar descendientes y Arturo, el aquí demandante. La segunda, María Emilia Armstrong Villaronga, vive y su único hijo es Eduardo del Valle, ambos aquí codemandados. En marzo de 1957 los demandados instaron ante el Tribunal Superior, Sala de Ponce, un procedimiento para protocolizar el testamento en cuestión y el codicilo. Mediante el codicilo la testadora designó al codemandado Eduardo Del Valle su albacea testamentario. Habiendo recaído providencia en el mencionado procedimiento declarando con lugar la solicitud de los allí peticionarios, se protocolizaron mediante escritura pública dichos dos documentos.

Alegó el demandante que el testamento era nulo por estar escrito tan solo en el idioma inglés. Impugnó también la validez del codicilo. El tribunal a quo declaró con lugar la demanda y dictó sentencia declarando nulos el testamento y el codicilo e impuso a los demandados las costas del litigio y la suma de $800 por concepto de honorarios de abogado. Como conclusión de derecho determinó el tribunal de instancia que la testadora era ciudadana de Nueva York a la fecha en que otorgó el testamento y a la fecha de su muerte. Las partes aceptan esa conclusión.

Los demandados recurrentes señalan los siguientes dos errores: (1) Que erró el tribunal a quo al resolver que el testamento es nulo por haber sido otorgado solamente en inglés y (2) al resolver que el codicilo es ineficaz porque intentaba complementar un testamento nulo.

Para declarar nulo el testamento el tribunal sentenciador se basó en el Artículo 633 del Código Civil, 31 L.P.R.A. sec. 2149, el cual transcribimos *verbatim* casi inmediatamente. La legislación del estado de Nueva York no exige que los testamentos que allí se otorguen en inglés deban también redactarse en español.[1] La legislación puertorriqueña en el Capítulo del Libro Tercero del Código Civil

---

[1] V. Art.2, Decedent Estate Law, en 13 McKinney's *Consolidated Laws of New York Annotated*, secs. 10–48.

dedicado a los testamentos contiene una disposición sobre el particular, el mencionado Artículo 633. Dicho artículo disponía($^2$) como sigue a la fecha de la muerte de la testadora:

"Para testar en un idioma distinto del castellano o del inglés, se requiere la presencia de dos intérpretes elegidos por el testador que traduzcan su disposición al castellano o al inglés. El testamento se deberá escribir en las dos lenguas, o sea en la del testador y en inglés o castellano. Lo mismo se hará cuando el testamento en inglés deba surtir sus efectos en todo o en parte en Puerto Rico, y en el caso de que el testamento en castellano deba surtir sus efectos en todo o en parte en los Estados Unidos."

Planteado así el conflicto entre la legislación del estado de Nueva York y del Estado Libre Asociado de Puerto Rico nos preguntamos: ¿Ha previsto nuestro ordenamiento jurídico esta situación de posibles conflictos de leyes en esta materia? ¿Cuenta nuestra legislación con disposiciones al efecto? ¿Debe regirse este testamento en cuanto a sus formalidades por la ley de Puerto Rico o por la ley de Nueva York?

Al examinar la ley aplicable podremos ver por qué se cometió el primer error señalado. El citado Artículo 633, 31 L.P.R.A. sec. 2149, que menciona lo relativo a los dos idiomas se refiere a testamentos otorgados en Puerto Rico. Dicho artículo aparece en el Subcapítulo III($^3$) del Capítulo 217 que es el capítulo que el Código Civil dedica a los testamentos. Dicho subcapítulo trata de la "Forma de los Testamentos."($^4$) En cuanto a los testamentos otorgados *fuera*

($^2$) Ese Artículo 633 fue enmendado por la Ley 92 de 24 de junio de 1958, 31 LPRA sec. 2149, Suplemento. La enmienda no es aplicable al caso de autos.

($^3$) Se desea aclarar que los *subcapítulos* en el Título 31 de LPRA (que comprende el Código Civil) son equivalentes a las *secciones* en la edición del Código de 1930, y que las *secciones* en LPRA equivalen a los *artículos* del Código en dicha edición de 1930, 31 LPRA sección 1, Historial.

($^4$) Ese Artículo 633 procede del 684 español. Tanto la propia lógica y organización del Código Civil como la lectura de los comentaristas y la enmienda de que fue objeto en el 1958 nos convence de que dicho artículo (antes y después de la enmienda) se refiere a los testamentos otorgados en

de Puerto Rico ya el Código había prescrito en su Artículo
11, en su parte pertinente, que "Las formas y solemnidades
de los contratos, testamentos y demás instrumentos públicos,
se rigen por las leyes del país en que se otorguen." (5)    Vol-
viendo al Capítulo 217 que trata de los testamentos, en su
Subcapítulo VIII que se titula "Testamento Hecho Fuera de
Puerto Rico" aparece el Artículo 666, 31 L.P.R.A. sec. 2221,
que dispone en lo pertinente que "Los ciudadanos de Puerto
Rico podrán testar fuera de Puerto Rico, sujetándose a las
formas establecidas por las leyes del país en que se hallen."
Este artículo armoniza perfectamente con el Artículo 11
antes citado.    Habiendo el Código en su Capítulo 217, Sub-
capítulo III, preceptuado detalladamente sobre la *forma* de
los testamentos, es natural que aclare (en su Artículo 666)
que en cuanto a los otorgados fuera de Puerto Rico los
ciudadanos puertorriqueños podrán testar sujetándose a las
formas establecidas por las leyes del país en que se hallen.
De esta manera se evita una interpretación que conflija con
el Artículo 11 del mismo Código.    Así por ejemplo, cuando
el Código en el Subcapítulo II del Capítulo 217, Artículo 618
(31 L.P.R.A. sec. 2123) *prohibe* los testamentos mancomu-
nados, luego en el Subcapítulo VII, que es el que trata de
los testamentos hechos *fuera* de Puerto Rico, el Código en
su Artículo 667 (31 L.P.R.A. sec. 2222) repite para aclarar
que no será válido en Puerto Rico el testamento mancomu-
nado que los ciudadanos de Puerto Rico otorguen en el extran-
jero aunque los autoricen las leyes del país en que lo otorguen.
Dicho Artículo 667 es una excepción de los Artículos 666
y 11 (*locus regit actum*) que como hemos visto son armó-
nicos entre sí.    *Colón* v. *Registrador*, 67 D.P.R. 17, 23

Puerto Rico.    Véase Puig Peña, *Tratado de Derecho Civil Español*, Tomo
V. Vol. 1, pp. 178–181;  De Diego, *Instituciones de Derecho Civil*, Tomo III,
pp. 95 y 103;  De Gasperi, *Derecho Hereditario*, Tomo III, pp. 311–313.
    (5) Este artículo y otros que aparecen en las Disposiciones Preliminares
del Código Civil contienen unos preceptos normativos que sitúan en su
correcta perspectiva otras disposiciones que más adelante contiene dicho
cuerpo legal.    Ayudan, por así decirlo, a que los árboles no impidan ver el
bosque.

(1947). Naturalmente nada tenía que disponer el Código en su Artículo 666 en cuanto a las formalidades que observarán los extranjeros al testar en el extranjero. El Código Civil es un cuerpo legal armónico y hay que leerlo en conjunto; no se pueden interpretar sus disposiciones aisladamente.

Es natural que nuestro Código disponga en detalle sobre las formalidades de los testamentos que se otorguen en Puerto Rico pero no así en cuanto a los que se otorguen en países o jurisdicciones extranjeras. Como bien señala el Profesor Valverde los testamentos otorgados en el extranjero no son objeto de la reglamentación detallada del Código Civil en cuanto a sus formalidades porque en ese aspecto esos testamentos son objeto del derecho internacional privado.[6] ■

Conviene mencionar, antes de seguir adelante, algo sobre terminología. A los efectos del derecho internacional privado se consideran extranjeras entre sí aquellas jurisdicciones con legislación propia sobre determinadas materias, cuyas legislaciones pueden venir en conflicto unas con otras, aunque esas jurisdicciones no sean necesariamente extranjeras a los fines del derecho internacional público. Esto es así tanto en el caso de los países organizados federalmente como lo son, con naturales variantes, los Estados Unidos, Suiza, Canadá y Australia, como en los casos de países unitarios que, como en el caso de España, las diversas regiones de que se formaron conservaron su legislación privada regional. Esas legislaciones llamadas estatales (en Norteamérica) y forales (en España) dan margen a colisiones de leyes que requieren los ajustes que proporciona el derecho internacional privado, llamado también conflicto de leyes.[7] Lo mismo

---

[6] Valverde, *Tratado de Derecho Civil Español*, 4a. edición, 1939, Tomo 5, p. 119. V. también Manresa, *Código Civil Español*, 6ta. ed., Tomo 5, p. 674.

[7] Castán, *Derecho Civil Español, Común y Foral*, 9a. ed., 1955, Tomo I, Vol. I, pp. 435–465; K. C. Wheare, *Federal Government*, Oxford University Press, 1946, pp. 1–34; *Robinson v. Norato*, 43 A.2d 467, 162 A.L.R.

ocurre, desde luego, entre las legislaciones de los países que son extranjeros entre sí también a la luz del derecho internacional público. ■

El derecho occidental ha comprendido tradicionalmente dos grandes normas en cuanto a la ley que debe regir las formalidades de los actos jurídicos. Como regla general el derecho civil consagra la norma contenida en el Artículo 11 de nuestro Código Civil (la ley del país en que el acto se otorgue) conocida como *lex loci actus* y también como *locus regit actum*. El derecho común anglosajón reconoce varias reglas pero en general puede decirse que en cuanto a sucesiones gobierna la otra gran norma a que nos referíamos, la regla *lex rei sitæ* que ordena que las formalidades de los testamentos se rijan por la ley del país en que estén sitos los inmuebles.([8]) Estos conceptos están íntimamente relacionados con la famosa doctrina de los Estatutos del derecho internacional privado, doctrina que ha dado margen a una profusa e interesante literatura en todos los países. No es necesario repetir aquí exposiciones que pueden encontrarse en los tratadistas.([9])

Nussbaum señala, que el derecho común se está acercando

368 (1945); *McFarland* v. *McFarland*, 19 S.E.2d 77, 82 (1942); *Hanley* v. *Donoghue*, 116 U. S. 1, 29 L. Ed. 535, 536 (1885); *Stewart* v. *Thompson*, 31 S. W. 133, 135 (1895).

([8]) Rabel, *The Conflict of Laws: A Comparative Study*, 1958, Vol. 4, p. 289; Nussbaum, *Principles of Private International Law*, 1943, p. 148; *Restatement of Conflict of Laws*, secciones 249 y 306; Goodrich, *Conflict of Laws*, 1949, p. 514; *Anotación* 169 A.L.R. 554 (1947).

([9]) Para un resumen en idioma español, véase Castan, *Derecho Civil Español Común y Foral*, 9a. ed. (1955), Tomo 1, Vol. 1, pp. 417–465; para un resumen en inglés sobre conflictos de leyes americano, véase Cheatham, *American Theories of Conflict of Laws: Their Role and Utility*, 58 Harvard L. R. 361 (1945); sobre las doctrinas estatutarias y contemporáneas sobre el problema véase Miaja, *Derecho Internacional Privado*, 2a. ed. (1956), Tomo I, Capítulo Primero; para discusiones de la regla *"locus regit actum"* véase Miaja, obra citada, Tomo II (1955) pp. 187–197; Yanguas, *Derecho International Privado*, Parte General, 2a. ed. (1958), pp. 281–292 y Goldschmidt, *Sistema y Filosofía del Derecho Internacional Privado*, 2a. ed. (1954), Tomo 2, pp. 199–255; sobre el problema específico de conflicto de leyes en cuanto a formalidades de los testamentos véase el Capítulo 67 titulado *"The Form of Wills"* en la monumental obra de Rabel citada en el escolio 8, Vol. 4, pp. 287–318; el mismo autor en *The Form of Wills*, en

a la regla *locus regit actum.* (¹⁰) Rabel comenta que es alentador observar cómo el derecho común se enriquece al aceptar la norma de la vigencia de la ley del lugar del otorgamiento y señala que la mayor parte de los estados de la Unión Americana ya han incorporado legislativamente dicha norma (¹¹) su derecho. El mismo autor indica que la tendencia es hacia permitir en forma opcional la operación de la ley del lugar del otorgamiento o la de la ley del domicilio o de la nacionalidad del otorgante al momento de la ejecución del acto. (¹²) En Estados Unidos la Ley Modelo sobre otorgamiento de testamentos consagra la norma *locus regit actum* y también reconoce la validez del testamento ejecutado de acuerdo con la ley vigente en el domicilio del testador al momento de testar. (¹³) Refiriéndose a dicha Ley Modelo, Nussbaum la clasifica como "una pieza de legislación extraordinaria y progresista." (¹⁴) Valga aclarar que el propio Estado de Nueva York ha incorporado en su legislación una

6 Vanderbilt L.R. 533 (1953) y Lorenzen, *The Validity of Wills, Deeds and Contracts as Regards Form in the Conflict of Laws* en 20 Yale Law Journal 427 (1911).

Los problemas del derecho internacional privado han interesado con frecuencia a los abogados y a los estudiosos del derecho en Puerto Rico. Entre otros, véase Guaroa Velázquez, *Directivas Fundamentales del Derecho Internacional Privado Puertorriqueño,* U.P.R., 1945; Lino Saldaña en 15 *Revista Jurídica de la Universidad de Puerto Rico* 77 (1945); Reseña del mismo autor en ese mismo tomo p. 315, y otra en el Vol. 17, pág. 366 (1948) de la misma revista; Salvador Casellas, el *Estatuto Real y el Testamento Otorgado Fuera de Puerto Rico,* 20 *Revista del Colegio de Abogados de Puerto Rico* 307 (1960); Mirabal Conde, *La Regla Lex Rei Sitæ en la Doctrina Puertorriqueña de Conflictos de Leyes,* 30 Revista Jurídica de la U.P.R. 57 (1961); Hernández, *Jurisprudencia del Tribunal Supremo de Puerto Rico en Materia de Derecho Internacional Privado,* 6 Revista Jurídica de la U.P.R. 147 (1937).

(¹⁰) Obra citada, págs. 148–149.

(¹¹) Artículo citado en 6 *Vanderbilt L. R.* 533, 542. V. también Lorenzen en 20 *Yale Law Journal* 432.

(¹²) El mismo artículo citado, p. 544.

(¹³) *Model Execution of Wills Act,* sec. 7 en *9A Uniform Laws Annotated* (1957) p. 347. Esta Ley Modelo fue aprobada por la Conferencia Nacional de Comisionados Sobre Leyes Uniformes y por la American Bar Association, en el año 1940. Dicha Ley Modelo sustituye la Ley Uniforme sobre testamentos ejecutados en el extranjero del 1910.

(¹⁴) Obra citada, p. 149.

disposición similar a la de la Ley Modelo y por lo tanto ha adoptado expresamente la regla *locus regit actum.*([15])

Los autores están contestes en que la tendencia moderna, tanto en el derecho civil como en el derecho común, de aceptar casi universalmente la regla *locus regit actum* se debe a que dicha regla resulta ser la más justa, conveniente y práctica. Por ejemplo, Nussbaum explica que la teoría moderna justifica dicha norma por consideraciones prácticas, las cuales son particularmente evidentes en los casos de los testamentos. Obviamente, dice, para una persona que va a testar en un país extranjero le es fácil cumplir con las formalidades prescritas por la ley de dicho país, mientras que le sería difícil en extremo, sino imposible, ejecutar el testamento cumpliendo esmeradamente con los requisitos de su ley nacional.([16]) A la inversa, también resultaría muy difícil e imposible a veces para el ciudadano extranjero que testa en su país y que tiene bienes inmuebles en otros países cumplir con las formalidades de la ley de esos otros países. Podemos imaginarnos la dificultad que tendría una persona que tiene que testar en Estados Unidos o en Inglaterra y que tuviese que cumplir con los requisitos de forma prescritos por nuestra legislación. Al efecto dice Yanguas:([17])

"La tesis más generalizada y que estimo más en lo cierto, busca el fundamento de la regla en razones de índole práctica. La regla locus regit actum nació porque la necesidad la impuso, y se ha difundido y afianzado universalmente por que su aplicación facilita la realización de los actos jurídicos, garantiza su veracidad y localiza los medios de prueba. Es útil, en todo caso, por brindar a las partes la posibilidad de acogerse a la forma establecida en una ley que está a su alcance inmediato. Es necesaria en determinadas ocasiones por ser diversa la nacionalidad de los contratantes, o por no existir en el lugar la institución o el medio indispensable para cumplir con la for-

---

([15]) Art. 2, Decedent Estate Law, 13 McKinney's *Consolidated Laws of New York Annotated*, sec. 22a; *In re Crandall*, 75 N.Y.S.2d 565 (1947); *In re Wizelholc's Estate*, 26 N.Y.S.2d 586 (1941).

([16]) Obra citada, p. 150.

([17]) Obra citada, p. 284.

malidad prevista en la ley nacional, como, de exigirse la escritura pública, ocurriría en Inglaterra, donde no hay notarios."

En igual sentido se manifiestan Miaja [18], Goldschmidt [19] y Manresa. [20]

Otra consideración que ha fomentado la adopción por tantas jurisdicciones de la regla liberal que contiene la mencionada Ley Modelo [21] es que habiendo el derecho superado su etapa primitiva formalista no se favorece la frustración de la voluntad de los testadores excepto por claras razones de ley o de orden público.   Naturalmente, se reconoce la necesidad de ciertas formalidades en estos actos pero ha cedido la intolerancia que solía existir en estas cuestiones. [22]

Habiendo examinado nuestro derecho positivo y la doctrina, veamos la jurisprudencia pertinente.   El tribunal sentenciador se apoya en el caso de *García* v. *De Jesús*, 79 D.P.R. 147 (1956) para basar su interpretación del Artículo 633, 31 L.P.R.A. sec. 2149, en el sentido de que si el testamento ha de trasmitir inmuebles en Puerto Rico es indispensable que esté escrito en los dos idiomas, inglés y español.   En primer lugar, la situación de hechos de este caso de *García* no es igual a la del de autos.   En el caso de *García* el testamento, aunque fue otorgado fuera de Puerto Rico, cumplía con los requisitos de forma tanto de la ley de Puerto Rico como con los de la ley del lugar de su otorgamiento y naturalmente fue declarado suficiente para trasmitir inmuebles sitos en Puerto Rico (Pág. 150).   De manera que en ese caso no se planteó ni se resolvió el punto que presenta este caso de Armstrong, en el cual se cumplieron los requisitos de forma que exige la ley de

[18] Obra citada, Vol. 2, p. 190.
[19] Obra citada, Vol. 2, p. 200, 202.
[20] Obra citada, Vol. 1, p. 179.
[21] *"A will executed outside this state in a manner prescribed by this Act, or a written will executed outside this state in a manner prescribed by the law of the place of its execution or by the law of the testator's domicile at the time of its execution, shall have the same force and effect in this state as if executed in this state in compliance with the provisions of this Act."*   Model Execution of Wills Act, sec. 7, 9A U.LA.
[22] Rabel, *The Conflict of Laws*, 1958, Vol. IX, pp. 287–288 y 297.

414

lugar del otorgamiento (Nueva York) pero no con los que exige la ley de Puerto Rico. Más aún, de la lectura de las páginas 149 y 150 del caso de *García* se ve claramente que allí insinuamos no estar de acuerdo con que en Puerto Rico impera la regla *lex ri sitae* en cuanto a las formalidades de los documentos y todas las citas que anotamos en el escolio Núm. 1, (p. 149) favorecen la regla *locus regit actum.* ■

Sin embargo nos confrontamos con el caso de *Melón* v. *Entidad Provincia Religiosa* resuelto por el Tribunal de Apelaciones, Primer Circuito, 189 F.2d 163 (1951), en cuyo caso se planteó el problema que aquí consideramos: si es necesario que un testamento otorgado fuera de Puerto Rico cumpla con los requisitos formales que exige la ley de Puerto Rico si dicho testamento ha de trasmitir inmuebles sitos en este país. En ese caso el Tribunal de Apelaciones en primer lugar expresó correctamente que es al Tribunal Supremo de Puerto Rico a quien compete interpretar las disposiciones de nuestro Código Civil y se propuso fallar de acuerdo con nuestra jurisprudencia. Al interpretarla, llegó a la conclusión de que, a pesar de la disposición explícita del Artículo 11 del Código Civil, en Puerto Rico imperaba la regla *lex rei sitae* en cuanto a las formas y solemnidades que han de observarse en el otorgamiento de testamentos hechos fuera de Puerto Rico que trasmitan inmuebles sitos aquí. En apoyo de su conclusión dicho tribunal cita los casos de *Colón et al.* v. *Registrador*, 22 D.P.R. 369 (1915); *Bracons* v. *Registrador*, 24 D.P.R. 753 (1917) y *Pastor* v. *Miró*, 34 D.P.R. 52 (1925). Interpretando que esos casos establecieron en Puerto Rico la regla *lex rei sitae* para los efectos ya dichos y pasando luego a leer la definición de esa regla en el *Restatement*([23]) llega el tribunal a la conclusión ya expresada, y anula por razón de formalidades el testamento de doña Pantaleona Melón Sáens, hecho en Barcelona de acuerdo con la ley de aquel lugar.

Es necesario entonces que reveamos esos casos. En el

---

([23]) *Restatement of Conflict of Law*, sec. 249.

caso de *Colón* v. *Registrador*, supra, la única cuestión planteada fue una de capacidad legal de las partes; esto es, si el tutor de menores españoles residentes en España podía proceder a la cancelación de una hipoteca sobre un inmueble radicado en Puerto Rico sin obtener la autorización del tribunal competente en Puerto Rico de acuerdo con los preceptos pertinentes del Código Civil. Se aplicó el Artículo 10 del Código Civil, según enmendado, y se resolvió que "Así en cuanto a la contratación como en cuanto a los derechos hereditarios" los inmuebles se regirán por la ley del país en que estén sitos. Se cita en dicho caso el de *Amadeo* v. *Registrador*, 3 D.P.R. 141, 2a. ed. (1903) en el cual también se trataba de un problema de capacidad de las partes. Este caso no dejó sin efecto el Artículo 11 del Código Civil.

En *Bracons* v. *Registrador*, supra, el problema era de derecho sustantivo sucesoral, de cuantía de bienes. Había que resolver si la ley rectora sobre los derechos hereditarios de las partes era la de Cataluña o la de Puerto Rico. Se sostuvo que regía la legislación de Puerto Rico. Tampoco resolvió este caso nada sobre las formalidades que debían observarse por el testamento otorgado en España. Sin embargo comprendemos que este caso se presta a confusión porque por vía de *dictum* se dijo a la página 757 que "esta corte trazó su línea de conducta con toda claridad, optando por aplicar en Puerto Rico íntegramente la teoría americana, esto es, que la *lex rei sitæ* es la norma que debe seguirse al determinar la capacidad legal de las partes en transacciones sobre bienes inmuebles." Es posible que la palabra "íntegramente" allí utilizada pudo dar margen a la interpretación de que este caso ha sido objeto.

En *Pastor* v. *Miró*, supra, el testador, Don Amador Pastor y Pastor, súbdito español residente en Puerto Rico, otorgó testamento abierto en Ponce en 1909 designando como único heredero a Bartolomé Pastor Gomila. En 1917 el testador se fue a España en donde murió tres meses después. Con posterioridad al otorgamiento del testamento Don Amador es-

cribió una carta en la cual decía "Yo tengo el testamento echo [sic] muriendo yo que vaya a Pepito porque no quiero . . ." La persona aludida como Pepito era José Miró Pastor. En otras dos cartas Don Amador hizo también referencias muy imprecisas en ese sentido. Muerto Don Amador, José acudió a un tribunal de España solicitando que dichas cartas fueran declaradas su testamento y él (José) su único heredero. Así lo resolvió el juzgado de primera instancia de Lonja de la Palma, en Islas Baleares, declarando dichas cartas suficiente testamento a los efectos de su protocolización, sin perjuicio de tercero, y las mismas fueron protocolizadas en una notaría de aquella ciudad.

Trabado un pleito en Puerto Rico entre Bartolomé Pastor y José Miró Pastor este Tribunal determinó que de acuerdo con el Artículo 698 del Código Civil, edición 1902, ([24]) las cartas debieron ser protocolizadas en Puerto Rico, lugar que fue el último domicilio del testador y ". . . de todos modos la expresada carta no contiene una disposición testamentaria . . ." pues ". . . las palabras contenidas en la carta que el apelante considera ser testamento ológrafo y las que estima ser su ratificación, no revisten tal carácter de testamento, pues perdidas en una extensa carta de negocios y familiar no demuestran la intención deliberada de disponer de sus bienes para después de su muerte, requisito que es esencial en los testamentos . . ."

Como podemos ver, en este caso no se planteó realmente el problema de las formas y solemnidades que en el otorgamiento del testamento de Don Amador debieron observarse. Se sostuvo el testamento otorgado en Ponce y no se aceptaron las cartas por dos razones, una, porque no fueron protocolizadas conforme lo exige el Código Civil y porque se encontró que las mismas no contenían una disposición testamentaria; no demostraban la intención deliberada de disponer de los bienes para después de la muerte, requisito esencial y sus-

---

([24]) Correspondiente al Artículo 639 del Código Civil, ed. 1930, 31 L.P.R.A. sec. 2163.

tantivo de un escrito que pretende ser un testamento. Pero este caso ha presentado dificultades en relación con el Artículo 11 del Código Civil porque repite el *dictum* del caso de Colón en esta forma:

"*Pero en el supuesto* de que se trasladó a España para residir permanentemente allí el resto de su vida y que por ésto fue ese su último domicilio, aún así, la resolución del Juzgado de Primera Instancia de Palma declarando testamento ológrafo de don Amador Pastor y Pastor las expresadas cartas y su protocolización en una notaría de aquella ciudad no puede producir efecto alguno en esta Isla donde radican los bienes inmuebles, porque según dijimos en el caso de Colón v. El Registrador, 22 D.P.R. 370, la adopción y aplicación de la regla lex rei sitae en la forma en que lo han hecho las cortes americanas, incluyendo y regulando la capacidad de las partes, no quebrante ni la letra ni el espíritu de nuestro Código Civil, ni ninguno de sus principios fundamentales y establece, de una vez para siempre, una regla fija, simple y racional, conducente a evitar la inconsistencia y confusión de nuestras decisiones referentes a los estatutos real y personal y al efecto de leyes extranjeras; y haciendo aplicación de esa doctrina en ese caso declaramos que un tutor español de menores residentes en España autorizado por el Consejo de Familia, conforme lo exige el Código Civil Español, necesita autorización judicial de la corte de distrito donde radiquen los bienes para proceder a la cancelación de una hipoteca sobre bienes inmuebles radicados en Puerto Rico." (Subrayado nuestro.)

La decisión de *Melón* v. *Entidad Provincia Religiosa* fue duramente criticada en una reseña de Phanos J. Eder que aparece en 1 *The American Journal of Comparative Law* 123 (1952). Allí se dice que no hay nada en los casos citados para sostener la opinión en el sentido de que la jurisprudencia de Puerto Rico había hecho extensiva la *lex rei sitae* a las formas y solemnidades de los testamentos y que dicha decisión se desvanece ante el principio *locus regit actum* explícitamente consagrado en el artículo 11 del Código Civil de Puerto Rico.

Consciente nosotros de la *dicta* que aparece en las decisiones de *Colón* v. *Registrador*, supra, y de *Pastor* v. *Miró*,

supra, podemos comprender la interpretación de esa jurisprudencia hecha en *Melón* v. *Entidad Provincia Religiosa*, supra, pero creemos que dicho caso de *Melón* no expresa correctamente la regla vigente en Puerto Rico. Esta es la comprendida en el Artículo 11 de nuestro Código Civil.

Podemos añadir que en el caso de *Melón* no se examinó otra jurisprudencia de este Tribunal que señala hacia una conclusión opuesta a la allí formulada. En *Rojas* v. *Registrador*, 27 D.P.R. 21 (1919) se trataba de una escritura otorgada en Nueva York mediante la cual se vendió un inmueble ubicado en Puerto Rico y allí dijimos:

"Tratándose de un documento otorgado en New York, traslativo del dominio de un bien inmueble radicado en esta isla, son de aplicación al presente caso los artículos 10 y 11 del Código Civil, de los cuales el primero ordena que los bienes inmuebles están sujetos a las leyes del país en que están sitos, *y el segundo que las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos se rigen por las leyes del país en que se otorguen.*" (Subrayado nuestro.)

En *Negrón* v. *Registrador*, 34 D.P.R. 787 (1925), también sostuvimos una escritura otorgada en Nueva York de acuerdo con las formalidades allí exigidas y se revocó la nota recurrida del Registrador. En *Vilella* v. *Registrador*, 36 D.P.R. 795 (1927) se trataba de un testamento otorgado en Madrid y el albacea vendió ciertas fincas radicadas en Puerto Rico. El Registrador denegó la inscripción cuya nota revocamos, fundándose en varios motivos, el número 4 de los cuales es el aquí pertinente, y al efecto dijimos a la página 801:

"Por el cuarto motivo parece sostenerse que los tribunales de Puerto Rico deben intervenir para determinar la validez y autenticidad del testamento por haber sido otorgado por la testadora en país extranjero. *De acuerdo con el artículo 11 del Código Civil disponiendo que las formas y solemnidades de los testamentos se rigen por las leyes del país en que se otorguen,* no es necesaria dicha intervención judicial para establecer su validez." (Subrayado nuestro.)

En *Esteves* v. *Registrador*, 43 D.P.R. 7 (1932), se sostuvo la nota del Registrador en la cual se señaló el defecto en una escritura de poder otorgada en Francia, de que el notario francés no certificó sobre el conocimiento de la otorgante ni suplió esa diligencia con testigos de conocimiento. Lo que dijimos en esa ocasión fue, a la página 9. "No habiéndose demostrado cuáles son las leyes en Francia, el artículo 11 del Código Civil no puede favorecer al recurrente. No incumbe al registrador demostrar que las leyes son distintas sino que la persona que solicita una inscripción debe demostrar cómo es la ley allí." Esta no es la situación del caso de autos.

En *Rosado* v. *Registrador*, 48 D.P.R. 555 (1935), se trataba de un contrato de hipoteca otorgado en Nueva York y cuya inscripción el Registrador denegó. Al nosotros ordenar la inscripción citamos los casos de *Negrón* v. *Registrador* y *Rojas* v. *Registrador*, supra, y una vez más repetimos, a la página 556:

"No hay duda de que según el artículo 10 del Código Civil los bienes inmuebles están sujetos a las leyes del país en que están sitos y *que según el artículo 11 del mismo código las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos se rigen por las leyes del país en que se otorgan,* a menos que sean autorizados por funcionarios públicos o consulares de los Estados Unidos en países extranjeros, en cuyo caso se observarán en su otorgamiento las solemnidades establecidas por las leyes de los Estados Unidos." (Subrayado nuestro.)

En *Colón* v. *Registrador*, 67 D.P.R. 17 (1947), caso que ya hemos mencionado, no aceptamos un testamento mancomunado otorgado en el extranjero por razón de ser dichos testamentos contrarios al orden público, y en *García* v. *De Jesús*, 79 D.P.R. 147 (1956), como hemos explicado anteriormente, no se planteó ni se resolvió el problema del caso de autos.

Al aplicar el Artículo 11 como lo hemos aplicado, estamos conscientes de las limitaciones del articulado del Código Civil relativo al derecho internacional privado. Dichas

limitaciones, desde luego, no son únicamente del Código puertorriqueño sino que existen en relación con otros códigos europeos y sudamericanos que siguen la tradición del derecho civil y que naturalmente han heredado las virtudes y, en este caso, las flaquezas de esa tradición. Dichos artículos si bien aportaron soluciones progresivas para su tiempo, hoy pueden ser mejoradas. La escasez de legislación en todos los países, los de derecho civil y los de derecho común, sobre derecho internacional privado es señalada por los comentaristas.[25] En las normas de conflicto de nuestro Código hay lagunas y es de esperarse que debido al creciente tráfico comercial entre Puerto Rico y los Estados Unidos han de surgir problemas de conflictos de leyes que requerirán que se vaya complementando nuestro derecho internacional privado ya sea mediante legislación o mediante jurisprudencia.[26] También recordamos que al aplicar la norma jurídica, o al crearla, es necesario considerar la realidad social y económica a la cual se aplica, realidad que Sauer llama "el subsuelo del caso".[27] Sin embargo y teniendo en mente estas consideraciones la ley en Puerto Rico sobre el punto planteado en este caso es la norma comprendida en el Artículo 11 del Código Civil. Además, como hemos dejado explicado, dicha regla resulta ser una buena norma de derecho internacional privado. ■

El segundo error señalado no se cometió. Al ejecutar el codicilo no se observaron las formalidades que exige la ley

---

[25] Véase, por ejemplo, Nussbaum, obra citada, pp. 44-45; Castán, obra citada, Tomo 1, Vol. 1, p. 463; Miaja, obra citada, Vol. 1, pp. 119-121.

[26] V. Castán, *La Formulación Judicial del Derecho*, (1954), pp. 143-160; Cardozo, *The Nature of the Judicial Process* (1921) Cap. III, pp. 98-141; Recasens Siches, *Vida Humana, Sociedad y Derecho*, 2da. ed., 1945, p. 321. Rabel hace un llamamiento en el sentido de que "El impresionante interés en la ley de conflictos...se dirija al descubrimiento de la solución deseable..." Véase el artículo de dicho autor "Conflicto de Leyes Comparado", versión española en 19 *Revista Jurídica de la Universidad de Puerto Rico* 157, 168 (1950), versión inglesa en 24 *Indiana Law Journal* 353 (1949).

[27] Sauer, *Filosofía Jurídica y Social*, trad. española de Legaz, 1933, p. 31.

del lugar de su otorgamiento y el mismo es ineficaz. No se firmó ante dos testigos ni aparecen firmando los dos testigos que exige la ley.([28])

*Por los anteriores motivos la sentencia del Tribunal Superior, Sala de Ponce, dictada en este caso en 6 de abril de 1959 se modificará revocando el pronunciamiento de dicho tribunal en el sentido de que el testamento es nulo y se confirmará su pronunciamiento en el sentido de que el codicilo es ineficaz. Se revocará también la imposición de las costas del litigio y honorarios de abogado que se hizo a los demandados.*

---

([28]) *Decedent Estate Law,* secs. 2 y 21, 13 McKinney's *Consolidated Laws of New York Annotated; In re Foster's Will,* 90 N.Y.S.2d 892 (1949).