GLADYS R. CABRER y AGUSTÍN CABRER, recurrentes, *v.* EL REGISTRADOR DE LA PROPIEDAD DE HUMACAO, recurrido.

*Número:* O-81-366 *Resuelto:* 25 de octubre de 1982

*Luz E. Santana Peña,* abogada de los recurrentes; el Registrador recurrido compareció por escrito.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

En testamento otorgado en el estado de Connecticut, la testadora legó su anillo de compromiso a una de sus dos hijas, allí nombrada; legó gran parte de lo que produjera la venta de la propiedad en que residía, a los fiduciarios de dos fideicomisos (*trusts*) que constituyó en documentos separados para beneficio, respectivamente, de cada una de sus dos hijas; legó otra propiedad a sus "descendientes" (*to my issue*), por estirpes; dispuso otros legados a favor de dos hermanas y de sus nietos; y dispuso que el remanente de sus bienes correspondería a su esposo. A su fallecimiento, la testadora era dueña de una mitad indivisa en un inmueble sito en Puerto Rico, inscrito en el Registro de la Propiedad, no mencionado en el testamento. Presentada al Registro la correspondiente documentación para la inscripción de la transmisión del dominio de dicha participación a favor del esposo y de una segunda adquirente, el Registrador denegó

la inscripción bajo el fundamento de que el testamento es nulo por haberse preterido a las dos hijas de la testadora, sus herederas forzosas en línea recta, según nuestras leyes. No estamos de acuerdo. Examinaremos la naturaleza jurídica y los efectos de la autoridad calificadora del Registrador de la Propiedad, la aplicación del estatuto real, y finalmente el aspecto de la preterición.

## I

Los esposos C. Wilson Chamberlin y Mary Marr Chamberlin, de Westport, Connecticut, compraron un solar en Palmas del Mar, jurisdicción de Humacao, que fue debidamente inscrito a nombre de ellos en el Registro de la Propiedad. La señora Chamberlin falleció en 1977 bajo testamento otorgado ante notario en Westport, Connecticut, el 9 de abril de 1975, en que dispuso de sus bienes en la forma siguiente:

(1) Legó (*bequeath*) a su hija Janice Gay Saxby su anillo de compromiso de diamantes;

(2) legó (*bequeath*) a su esposo C. Wilson Chamberlin sus bienes personales (*tangible personal property*), excepto dinero en efectivo o en depósito o valores (*securities*), si le sobrevivía, estableciendo determinadas disposiciones para el caso de que no le sobreviviese;

(3) dijo ser dueña de una propiedad inmueble en Westport, Connecticut, en que tenía establecida su residencia, y dispuso que su esposo podría seguirla ocupando por dos años y por el tiempo adicional necesario para venderla, en cuyo caso el producido de la venta debía distribuirse así: cinco por ciento para su hermana Doris Preble McSorley, si le sobrevivía, y en su defecto a su hermana Louise Hampton Marr si le sobrevivía; nueve por ciento a su referida hermana Louise y, en defecto de que ésta no le sobreviviese, a su otra mencionada hermana Doris, si le sobrevivía; cuarentitrés por ciento a los fiduciarios (*trustees*) de un fideicomiso (*trust*) que convino en la misma fecha del testamento, 9 de abril de 1975, para beneficio de su hija mencionada Janice Gay Saxby; treintiocho por ciento para los mismos fiduciarios de otro fideicomiso conve-

nido también en la misma fecha del anterior para beneficio de otra hija suya, Marylin Bell; y el restante cinco por ciento para los descendientes (*the issue of*) de su mencionada hija Marylin que estuvieren vivos, por estirpes;

(4) legó (*devise*) a sus hermanas Louise y Doris, por partes iguales, todo derecho o interés en una propiedad inmueble radicada en Great Cranberry Island, estado de Maine;

(5) legó (*devise and bequeath*) a los descendientes que la sobrevivieran (*to my issue who survive me*), por estirpes, todo derecho o interés en una residencia de veraneo llamada Luck Grove en el pueblo de Bridgton, condado de Cumberland, estado de Maine, y el mobiliario de la misma, "excepto el bote que allí se guarda y sus accesorios";

(6) legó (*devise and bequeath*) todo el remanente de sus bienes, de la naturaleza que fueren y dondequiera que se hallaren (*of whatever nature and wheresoever situated*) a su mencionado esposo C. Wilson Chamberlin, si le sobrevivía y, en defecto de ello, a distribuirse en las mismas proporciones y a favor de las mismas personas y fideicomisos a que se hace referencia en el apartado (3) que antecede.

Como puede notarse, el inmueble radicado en Palmas del Mar no fue mencionado por la testadora y debe considerarse incluido en el apartado (6) como parte del "remanente de sus bienes", que legó a su esposo. Éste convino vender dicho inmueble a la aquí recurrente, Sra. Gladys R. Cabrer, pero falleció el 28 de diciembre de 1978, también bajo testamento otorgado en Westport, Connecticut, antes de poderse otorgar la correspondiente escritura de compraventa. Así las cosas, la Sra. Louise Hampton Marr, en su carácter de albacea o representante legal de la sucesión de C. Wilson Chamberlin, otorgó poder especial en el estado de Maine, a favor del Sr. Julio C. Rivera, de Humacao, para que a su nombre y en su referida capacidad otorgase la escritura de compraventa de la finca de Palmas del Mar a favor de la señora Cabrer. Se otorgó dicha escritura el 27 de marzo de 1981.

Los testamentos de los esposos Chamberlin y la mencio-

nada escritura de compraventa fueron presentados al Registro de la Propiedad para su inscripción. Dichos documentos fueron debidamente acompañados de los complementarios correspondientes. No hay controversia en cuanto al otorgamiento de los testamentos y su guarda y autenticidad, el fallecimiento de los testadores, la autoridad de la poderdante Louise Hampton Marr para vender, y la liquidación del aspecto contributivo.

La controversia se centra en la negativa del Registrador a aceptar como válido el testamento de la señora Chamberlin. Aduce el Registrador que surge del propio testamento que la testadora tenía dos hijas, Janice Gay Saxby y Marylin Bell, que fueron preteridas. La recurrente argumenta en contrario que no hay preterición, pues se menciona en el testamento el legado que la testadora hizo —apartado (3), parte I, *ante*— a favor de fideicomisos constituidos en la misma fecha del testamento para beneficio de sus mencionadas hijas. Dice además la recurrente que el Registrador carece de autoridad para declarar nulo un testamento. Veamos estas cuestiones por separado.

## II

■ Consideramos en primer lugar la naturaleza jurídica y el efecto de la función calificadora del Registrador de la Propiedad. Sobre el particular señalamos en *Muller Vergara* v. *Registrador*, 101 D.P.R. 587, 595 (1973), citando de Roca Sastre, que nuestro sistema registral inmobiliario excluye " 'toda idea de que el Registrador es un Juez . . . ,' ni tiene por objeto '[d]eclarar la existencia o inexistencia de un derecho dudoso. . . .' La calificación registral está limitada a los solos efectos de extender, suspender o negar la inscripción o anotación, nota marginal o cancelación solicitada". Véase *Autoridad de Tierras* v. *Registrador*, 62 D.P.R. 506, 509 (1943), citado y seguido en *Muller Vergara*, supra.

430

Dicha doctrina se basó en el Art. 18 de la entonces vigente Ley Hipotecaria y en el Art. 78 de su Reglamento. (¹)

La Ley Hipotecaria de 1979, vigente al presentarse para inscripción los documentos objeto del presente recurso, derogó a la anterior Ley (de 1893) y su Reglamento, y dio nueva redacción a los citados Arts. 18 y 78 en sus equivalentes bajo la nueva Ley, que son sus Arts. 64 y 67. El Art. 64 (30 L.P.R.A. sec. 2267) dispone en su primer párrafo, aquí pertinente, como sigue:

> Los Registradores calificarán, bajo su responsabilidad la legalidad de los documentos de toda clase en cuya virtud se solicite un asiento. Dicha calificación comprenderá las formas extrínsecas de los documentos presentados, la capacidad de los otorgantes *y la validez de los actos y contratos contenidos en tales documentos.* Los Registradores fundamentarán su calificación de los actos y contratos a registrarse en los documentos que se presenten, los asientos registrales vigentes y las leyes. (Énfasis suplido.)

Esta redacción sigue en líneas generales la del Art. 18 de la Ley Hipotecaria española, adoptada por Decreto de 8 de febrero de 1946, que dice así:

---

(¹) El Art. 18 de la Ley, 30 L.P.R.A. sec. 43, disponía en su primer párrafo, que es lo aquí pertinente, lo siguiente:

"Los Registradores calificarán bajo su responsabilidad la legalidad de las escrituras en cuya virtud se solicite la inscripción y la capacidad de los otorgantes por lo que resulte de las mismas escrituras."

El Art. 78 del Reglamento, 30 L.P.R.A. sec. 936, decía así:

"La calificación que hagan los registradores, o en su caso el presidente de la audiencia, de la legalidad de las escrituras presentadas, de la capacidad de los otorgantes o de la competencia de los jueces o tribunales que ordenen las cancelaciones, según lo prevenido en las secs. 43, 174 y 175 de este título, se entenderá limitada para el efecto de negar, suspender o admitir la inscripción, y no impedirá ni prejuzgará el juicio que pueda seguirse en los tribunales sobre la nulidad de la misma escritura, o la competencia del mismo juez o tribunal, a menos que llegue a dictarse sentencia de casación.

"Si de la ejecutoria que en dicho juicio recayere, resultare que fue mal calificada la escritura, la capacidad de los otorgantes o la competencia del juez o tribunal, el registrador hará la inscripción o cancelará la que hubiere hecho, según el caso, tomando el nuevo asiento la fecha del de presentación del título que hubiere dado lugar al incidente."

Los Registradores calificarán, bajo su responsabilidad, la legalidad de las formas extrínsecas de los documentos de toda clase, en cuya virtud se solicite la inscripción, así como la capacidad de los otorgantes *y la validez de los actos dispositivos contenidos en las escrituras públicas,* por lo que resulte de ellas y de los asientos del Registro. (Énfasis suplido.)

 Sin que invada el campo del Tribunal, al que corresponde dirimir controversias y adjudicar derechos, el Registrador ha de comprobar si el caso jurídico en sí, o sea el contenido de la escritura pública, es válido o nulo, tanto como tal como en sus condiciones. Roca Sastre, *Derecho Hipotecario*, 6ta ed., Barcelona, Ed. Bosch, 1968, T.II, págs. 254–255. Esta facultad calificadora del Registrador es la que nutre el principio de legalidad, base de la legitimación en que descansa el sistema.

El Art. 67 de la Ley, 30 L.P.R.A. sec. 2270, dispone:

La calificación hecha por el Registrador de los documentos presentados será a los únicos efectos de extender o denegar la inscripción, anotación, nota o cancelación solicitada, y no impedirá ni prejuzgará el juicio que pueda seguirse en los tribunales sobre la validez de los documentos calificados, debiendo atenerse el Registrador a lo que en aquél se resuelva.

Este artículo corresponde, aunque no en idéntica redacción, pero sí en igual substancia, al Art. 100 del Reglamento para la ejecución de la Ley Hipotecaria española de 1946, que dice así en parte:

La calificación de los documentos presentados en el Registro se entenderá limitada a los efectos de extender, suspender o negar la inscripción, anotación, nota marginal o cancelación solicitada; y no impedirá el procedimiento que pueda seguirse ante los Tribunales sobre la validez o nulidad del título, o sobre la competencia del Juez o Tribunal, ni prejuzgará los resultados del mismo procedimiento.

La incorporación en la Ley Hipotecaria española de 1946 y en la nuestra de 1979 de la facultad del Registrador para

calificar la validez de los actos dispositivos comprendidos en las escrituras no ha producido, en efecto, cambio alguno. Lo que se ha hecho es recoger en los nuevos textos lo que la jurisprudencia y la doctrina habían reconocido. Véase Vázquez Bote, *Elementos de Derecho hipotecario puertorriqueño*, Ed. Lex, 1973, pág. 304 y ss., y en particular la nota 6 en la pág. 306, en que se refiere al Art. 159 del Proyecto de Código Hipotecario que estaba siendo considerado en 1973, muy similar en su redacción al Art. 18 de la vigente Ley española y al Art. 64 de la nuestra de 1979, donde dice: "Como puede comprobarse, el precepto ha recogido como principios de su contenido toda la doctrina jurisprudencial existente al efecto sobre los distintos problemas que la regulación actualmente vigente ha venido planteando."

En resumen, la nueva Ley Hipotecaria no ha convertido al Registrador en un juez cuyos decretos sean determinantes *erga omnes* de la validez de los actos o contratos contenidos en los documentos sometidos a su calificación. Esa autoridad queda reservada a los tribunales de justicia mediante juicios plenarios en que oyen testigos y reciben pruebas aportadas por partes en contienda. La función del Registrador tiene, como señala Roca Sastre, *Derecho Hipotecario*, 7ma ed., Barcelona, Ed. Bosch, 1979, T. II, pág. 284, la naturaleza propia de los llamados actos de jurisdicción voluntaria. Indica también, pág. 265: "No tiene la calificación registral por objeto *declarar la existencia o inexistencia de un derecho dudoso o controvertido entre partes contendientes*, sino simplemente *publicar*, mediante su inscripción, *un derecho real o situación jurídica inmobiliaria.*" (Énfasis en el original.)

La importancia de que tanto en nuestra Ley de 1979 como en la española de 1946 se haya reconocido expresamente la autoridad del Registrador para calificar la validez de los actos o contratos contenidos en los documentos que se le presenten radica, como apunta Roca Sastre, *op. cit.*, pág. 266, en que entre los efectos de la inscripción está "integrar

el contenido de los Registros de la propiedad, con los efectos derivados del *principio de legitimación* y, sobre todo, los del *principio de fe pública registral*, para comprobar la trascendencia que ofrece el hecho de que un título pueda o no inscribirse según sea la decisión calificadora del Registrador de la propiedad, confirmada por las resoluciones que recaigan en los recursos interpuestos contra la misma. Cuanto más enérgicos sean los efectos que un sistema inmobiliario registral atribuya a la inscripción, tanto más será importante la función calificadora del Registrador". Señala, además, Roca Sastre:

> Aparte de este punto de vista procede observar que la función calificadora del Registrador constituye uno de los dispositivos básicos dirigidos a dar efectividad al *principio de legalidad*, que, dado el amplio alcance que en nuestro sistema registral adopta, es expresión exacta de la importante trascendencia que reviste la función calificadora del Registrador en nuestro sistema inmobiliario registral. *Op. cit.*, pág. 266.

### III

Examinemos lo relativo a la validez del testamento de la Sra. Mary Marr Chamberlin.

A.

No está en discusión en este caso si en el otorgamiento del testamento se observaron las formalidades y solemnidades requeridas por ley en el estado de Connecticut, donde se otorgó. De conformidad con el Art. 11 del Código Civil, 31 L.P.R.A. sec. 11, "[l]as formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, se rigen por las leyes del país en que se otorguen". Cabe tener presente, no obstante, que para que se inscriba en Puerto Rico un testamento otorgado fuera de esta jurisdicción, compete a la parte interesada en ello acreditar que se cumplieron en su otorgamiento las formas y solemnidades requeridas por las leyes del lugar de su otorgamiento. *Vda. de Ruiz* v. *Registrador*, 93 D.P.R. 914, 921 (1967);

*Esteves, Comisionado* v. *Registrador,* 43 D.P.R. 7 (1932); *Rojas, Randall & Co.* v. *El Registrador,* 27 D.P.R. 21 (1919). No hacerlo constituye un defecto subsanable según se resolvió en este último caso.

■ El Art. 10 del Código Civil, 31 L.P.R.A. sec. 10, dispone, por otra parte, como sigue:

> Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos.

De conformidad con este precepto, es harto conocido el principio de que la transmisión de bienes inmuebles sitos en Puerto Rico se rige por nuestras leyes. *Pueblo* v. *Denis Rivera,* 98 D.P.R. 704, 714 (1970); *Martínez* v. *V. de Martínez,* 88 D.P.R. 443, 455 (1963); *Lókpez* v. *Sotelo,* 70 D.P.R. 501 (1949); *Rojas, Randall & Co.* v. *El Registrador,* supra; *Bracons* v. *Registrador de San Juan,* 24 D.P.R. 753 (1917); *Colón et al.* v. *El Registrador,* 22 D.P.R. 369 (1915); *Amadeo* v. *El Registrador,* 3 D.P.R. 141 (1903).

Es de notarse que en su redacción original el Art. 10 de nuestro Código Civil seguía en su totalidad la redacción del artículo del mismo número del Código Civil español, que disponía:

> Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos.

> Sin embargo, las sucesiones legítimas y las testamentarias, así respecto al orden de suceder como a la cuantía de los derechos sucesorios y a la validez intrínseca de sus disposiciones, se regularán por la ley nacional de la persona de cuya sucesión se trate, cualesquiera que sean la naturaleza de los bienes y el país en que se encuentren.

> Los vizcaínos, aunque residan en las villas, seguirán sometidos, en cuanto a los bienes que posean en la tierra llana, a la ley 15, tít. 20 del Fuero de Vizcaya.

Al hacerse la revisión del 1902, se eliminaron de este artículo sus dos últimos párrafos, quedando su redacción limitada al primer párrafo, que es como está vigente desde entonces. De esta suerte, la excepción que se hacía en materia de las sucesiones legítimas y testamentarias en cuanto a la aplicación del estatuto real quedaron eliminadas. Según se expresó en *Bracons* v. *Registrador de San Juan,* supra, pág. 757, la Comisión Codificadora que preparó el proyecto del Código Civil revisado dio la siguiente razón para el cambio:

> "La reforma más importante hecha al Título Preliminar del Código ha sido la relativa a restringir la doctrina de los estatutos personal y real, tomando en cuenta y aplicando el principio general del derecho civil americano de que los derechos respecto de los bienes inmuebles han de regularse totalmente, así en cuanto a la *contratación* como en cuanto a los derechos hereditarios, por la ley del país en que están sitos."

Para resumir, y en lo que toca específicamente a un testamento otorgado fuera de Puerto Rico en que opere la transmisión de bienes inmuebles sitos aquí, será válido en cuanto en su otorgamiento se observen las formas y solemnidades requeridas por las leyes del lugar de su otorgamiento, pero no será válido en cuanto sus disposiciones estén en conflicto con disposiciones substantivas de nuestras leyes. Veánse *Armstrong* v. *Armstrong,* 85 D.P.R. 404 (1962); y *Quiñones* v. *Escalera Irizarry,* 99 D.P.R. 962, 966 (1971). (²)

---

(²) El Art. 46 de la Ley Hipotecaria vigente (1979), 30 L.P.R.A. sec. 2209, se aparta de la redacción de su equivalente de la legislación anterior (Art. 52 del anterior Reglamento Hipotecario de 1893 (30 L.P.R.A. sec. 882)) y recoge las disposiciones de los Arts. 10 y 11 del Código Civil al disponer:

"Los documentos otorgados fuera de Puerto Rico podrán ser inscritos si reúnen los requisitos siguientes:

"Primero: Que el asunto o materia del acto o contrato sea lícito y permitido por las leyes de Puerto Rico.

. . . . . . . . .

"Tercero: Que en el otorgamiento se hayan observado las formas y solemni-

B.

■ La nota denegatoria del Registrador, de que aquí se recurre, señaló que el testamento de la señora Chamberlin es nulo por haberse preterido a sus hijas Janice y Marylin, quienes conforme a nuestras leyes son herederas forzosas de la testadora en línea recta. Cabe señalar, antes de considerar esta cuestión, que no es correcto afirmar que la preterición de un heredero forzoso produce la nulidad del testamento. El efecto de la preterición de un heredero forzoso en línea recta es la nulidad de la institución de heredero, que no debe ser confundida con la nulidad del testamento, según señalamos en *Díaz Lamoutte* v. *Luciano*, 85 D.P.R. 834, 857–858 (1962). Véase al mismo efecto, *Blanco* v. *Sucn. Blanco Sancio*, 106 D.P.R. 471, 478 (1977). Así se desprende del Art. 742 del Código Civil, 31 L.P.R.A. sec. 2368, que dispone:

> La preterición de alguno o de todos los herederos forzosos en línea recta, sea que vivan al otorgarse el testamento o sea que nazcan después de muerto el testador, anulará la institución del heredero; pero valdrán las mandas y mejoras cuando no sean inoficiosas.
>
> La preterición del viudo o viuda no anula la institución; pero el preterido conservará los derechos que le concede este título.
>
> Si los herederos forzosos preteridos mueren antes que el testador, la institución surtirá efecto.

■ Si Janice y Marylin fueron preteridas, sería nula la institución de herederos recaída en beneficio del viudo de la testadora y, por tanto, no inscribible a su favor la participación que a ella correspondía en la propiedad sita en

---

dades del territorio o país donde se han verificado los actos o contratos, o las de Puerto Rico.

. . . . . . . .

"Quinto: Que dicho documento haya sido protocolizado por un notario en Puerto Rico si para su eficacia no requiere trámite judicial.

. . . . . . . ."

Palmas del Mar. Art. 46, Ley Hipotecaria de 1979 (30 L.P.R.A. sec. 2209) en su apartado primero.(³) Como veremos, no fueron preteridas.

La preterición consiste —según señalamos en *Blanco* v. *Sucn. Blanco Sancio*, supra, pág. 476, citando de Manresa, *Comentarios al Código Civil español*— en omitir al heredero en el testamento. O no se le nombra siquiera, o aun nombrándole como padre, hijo, etc., no se le instituye heredero ni se le deshereda expresamente, ni se le asigna parte alguna de los bienes, resultando privado de un modo tácito de su derecho a legítima.

J. Castán Tobeñas, *Derecho civil español, común y foral*, 7ma ed., Madrid, Ed. Reus, 1973, T. VI, Vol. II, al comentar sobre el concepto de la preterición en el Art. 814 del Código Civil español, equivalente al Art. 742 nuestro, antes transcrito, señala, pág. 654, entre los requisitos para que exista preterición en su sentido legal o técnico, "[q]ue la omisión sea completa o total, pues la institución en cantidad insuficiente sólo da derecho a pedir el complemento de legítima conforme al artículo 815 [743 de nuestro Código Civil, 31 L.P.R.A. sec. 2369]". Si en el testamento se menciona al legitimario, al que se le reconoce su condición familiar *y se le deja algo*, "[n]o cabe sombra de duda de que no hay preterición". Castán, *op. cit.*, pág. 655, citando a Vallet de Goytisolo. Véase, al mismo efecto, *Sosa* v. *Sosa*, 66 D.P.R. 606, 618 (1946).

La recurrente limita su argumentación de que las hijas de la testadora no fueron preteridas al hecho de que se. las menciona como beneficiarias en los dos fideicomisos a que se hace referencia en el testamento. No tenemos que resolver específicamente este punto, es decir, si la mención de ellas como beneficiarias de los fideicomisos existentes equivale a su no preterición. Valga señalar, sin embargo, que si bien en un fideicomiso el título de propiedad de los

---

(³) Aparece transcrito en el escolio núm. 2, *ante*.

bienes fideicomitidos queda investido en el fiduciario, "la 'propiedad en equidad' descansa en los beneficiarios". *Álvarez* v. *Srio. de Hacienda,* 80 D.P.R. 16, 20 (1957).

Han pasado por alto, tanto la recurrente como el Registrador, que aparte del fideicomiso hay disposiciones en el testamento equivalentes, cuando menos, a legados a favor de las hijas de la testadora. Específicamente se lega a Janice el "anillo de compromiso de diamantes". No es necesario embarcarnos en disquisiciones sobre el posible valor de la alhaja, pero "algo" debe valer desde el punto de vista material. Y si a un heredero forzoso se le deja "algo", "[n]o cabe sombra de duda de que no hay preterición". Castán, y Vallet de Goytisolo, *supra.*

Esto en cuanto a Janice. En cuanto a ambas hijas, Janice y Marylin, no puede ignorarse el apartado quinto del testamento, que copiado a la letra en su texto en inglés, dice:

> *I give, devise and bequeath to my issue who survive me, per stirpes, all my interest in a summer residence at Luck Grove, so-called, in the Town of Bridgton, County of Cumberland and State of Maine, together with my interest in all the furniture, furnishings and other tangible personal property belonging thereto (excepting the boat kept there, and its accessories).*

La frase clave es *"to my issue who survive me, per stirpes".* La palabra *issue* puede significar que incluye a todos los descendientes, o que se limita a los hijos. Véase *Black's Law Dictionary,* 5ta ed., St. Paul, Minnesota, West Publishing Co., 1979, pág. 746. (4) Pero, al añadir *"per stirpes"*, es inequívoca la intención de la testadora de hacer el legado a sus dos hijas, quedando reservado el derecho de

---

(4) Dice, al referirse a la acepción de dicha palabra en relación con testamentarías:

"*But, when used in wills, it is, of course, subject to the rule of construction that the intention of the testator, as ascertained from the language used by him; and hence issue may, in such a connection, be restricted to children, or to descendants living at the death of the testator, where such an intention clearly appears.*

"*The term 'issue' and 'descendants' have been held to be co-extensive and interchangeable.* In re Radt's Will, 6 Misc.2d 716, 167 N.Y.S.2d 817, 818."

representación de los nietos si alguna hija o ambas le premurieran. Véase G. Velázquez, *Teoría del Derecho sucesorio puertorriqueño*, 2da ed., Ed. Equity, Sec. 15, págs. 16–17; y el Art. 889 del Código Civil, 31 L.P.R.A. sec. 2623.[5] El término *"per stirpes"* tiene en el idioma inglés y en el Derecho anglosajón el mismo significado que en nuestro Derecho. Véase *Black's Law Dictionary*, ya citado, pág. 1269.

## IV

Ordena el Art. 1009 del Código Civil, 31 L.P.R.A. sec. 2875, que cuando el testador hiciere, por acto entre vivos o por última voluntad, la partición de sus bienes, *se pasará por ella* en cuanto no perjudique la legítima de los herederos forzosos. Dispone el Art. 1021 del mismo Código, 31 L.P.R.A. sec. 2901, que la partición legalmente hecha confiere a cada heredero la propiedad exclusiva de los bienes que le hayan sido adjudicados; y el Art. 1028 (31 L.P.R.A. sec. 2913), que la partición hecha por el difunto no puede ser impugnada por causa de lesión, sino en el caso que perjudique la legítima de los herederos forzosos; y finalmente declara el Art. 743 (31 L.P.R.A. sec. 2369), que el heredero forzoso a quien el testador haya dejado por cualquier título menos de la legítima que le corresponda, podrá pedir el complemento de la misma. La testadora Mary Marr Chamberlin hizo una distribución o partición testamentaria que en su aplicación al inmueble radicado en Puerto Rico creó un estado de derecho nacido de su voluntad, que subsiste mientras no se lleve a los tribunales, directamente y en debida forma, la cuestión de haberse lesionado la legítima,[6] por lo que los Registradores no pueden

---

[5] Dispone:

"Siempre que se herede por representación, la división de la herencia se hará por estirpes, de modo que el representante o representantes no hereden más de lo que heredaría su representado si viviera."

[6] Notamos que la testadora afectó extensamente la legítima de sus hijas imponiéndoles un fideicomiso. En Puerto Rico tal fideicomiso es *nulo*, según resuelto en *Clavell Rodríguez* v. *Registrador*, 95 D.P.R. 348 (1967).

rechazar la titulación bajo el pretexto de posibles extralimitaciones en la partición. J. Morell y Terry, *Legislación Hipotecaria*, 2da ed., Madrid, Ed. Reus, 1927, T. 2, pág. 523. Aquí tenemos resuelto que no es de la competencia del Registrador denegar la inscripción fundado en la anulabilidad de la partición, pues ésta es determinación que corresponde a "una corte de justicia a instancia de parte interesada". *Rodríguez Hnos.* v. *El Reg. de San Juan*, 29 D.P.R. 1064, 1065 (1921). ([7]) *Cf.* Castán Tobeñas, *op. cit.*, T. VI, Vol. II, pág. 307; y T. VI, Vol. I, pág. 271.

Por los fundamentos expresados, *se revocará la calificación recurrida, y se ordenará la inscripción.*

---

([7]) "El art. 1.056 [1009 del Código Civil nuestro] y menos el 1.075 [1028 de nuestro Código Civil], no exigen una demostración *a priori* de que la partición no perjudica a los herederos legitimarios, sino que ordenan *se pase por ella*, reservando las acciones de impugnación a los lesionados (resolución de 16 de noviembre de 1922)." (Énfasis suplido.) J. Castán Tobeñas, *Derecho civil español, común y foral*, 7ma ed., Madrid, Ed. Reus, 1960, T. VI, Vol. I, pág. 271, esc. 1.

"Claro está que en la partición el testador no puede perjudicar las legítimas, pero a los efectos registrales, de acuerdo con la doctrina de la resolución de 16 de noviembre de 1922, no cabe exigir una demostración *a priori* de que no existe este perjuicio legitimario, habida cuenta además de que dicho art. 1.056 del Código Civil ordena que se pase por la partición hecha por el testador, siempre con la reserva de las acciones de impugnación derivadas de la posible lesión legitimaria." Roca Sastre, *Derecho Hipotecario*, 7ma ed., Ed. Bosch, 1979, T. III, pág. 743.